Council, as you're collecting your thoughts, let me just raise a question with you. There are two cases, each of which raise significant issues. We want to be sure that we give you sufficient attention to each case, but we'll let you tell us how you want to divide the time. Well, Eduardo's council and I represent Ricardo. Ricardo. We had agreed to split the time evenly, 10 minutes each. All right, all right. And I'm going to go first. I'm going to reserve two minutes of my time for rebuttal. Very good. You may proceed. Thank you. May it please the court, my name is Renato Mariotti. I represent Ricardo Sandoval-Mendoza. Ricardo Sandoval-Mendoza and his brother Eduardo are identical twins. They look alike. They have a close personal relationship, and they speak to each other many times a day. This much is undisputed. At its core, this is a case of mistaken identity and guilt by association. The evidence of Ricardo's involvement in his twin brother's conspiracy is scant. He was not present at any of the drug sales. He did not negotiate the terms of those sales, and he was not part of any of the phone calls between Eduardo and the government agents. His fingerprints weren't found on any of the drugs sold to the government or anywhere else suspicious. At most, the evidence introduced by the government suggests that Ricardo was tangentially involved in a single transaction, not a member of a 19-month conspiracy spanning three transactions involving over 11 pounds of methamphetamine. Moreover, the evidence that Ricardo was involved in that single transaction is faulty. Counsel, it seems to me that the real crux of your case is whether the court erred in admitting Eduardo's out-of-court statements as co-conspirator hearsay. That's one way of approaching it. Basically, let me lay it out, and you tell me if I'm missing something. It seems to me that if Eduardo's statements come in, my brother this, my brother that, I'm waiting for my brother, he's going to get the dope and so forth. If Eduardo's statements come in, there's no question that there's plenty of evidence to convict Ricardo. If Eduardo's statements are kept out, then it's considerably thinner. Is that right so far? I would agree with Your Honor's statement to the extent that I agree that it is thinner if those statements don't come in. But I would say that one of Your Honor's statements, you know, my brother is going to get the drugs, was not one of the statements. You know, I think all the statements that he made can have an innocent interpretation. Oh, sure they can, but that strikes me as just a jury argument. Brother is like somebody saying, hey, bro. The problem there is he says my brother, which is not usually how you use it. And it strikes me as just for a jury. That's fine. I mean, I would argue that the statements themselves, in and of themselves, are not enough to convict. And furthermore, this Court has said that there has to be independent, fairly incriminating evidence. Okay. Let me get to the admission. Why isn't it the statements themselves can be considered under board jally for the judge to determine whether there is a conspiracy and the defendant is part of it. Right. To make the decision on admitting the evidence. There has to be something else. Something fairly incriminating. Something fairly incriminating. You're right. Now, why isn't it fairly incriminating that when Ricardo gets caught, he has a list of the names and phone numbers of the dope dealers that Eduardo was using? Well, first of all, let me say this. It's not like there's a long list. It was two brothers, and he had their phone number. You know, these are twin brothers. It's not surprising they associate with the same people. What phone numbers did – I remember Ricardo had some names and phone numbers when he got caught. It was the Revuelta brothers, the Jerry and some other – I forget the other name of the other brother. Now, were these suppliers? They were suppliers. They were his brother's suppliers. The Revuelta brothers? Revuelta, R-E-V-E-U-L-T-A, I think. Close enough. Close enough. And, okay, why isn't that enough? That he had those names? Well, those names – all those names show is that he associated with people that were close to his brother. It's not surprising. They're twin brothers. I mean, that alone – That strikes me as a jury argument. Well, it strikes me as not fairly – I mean, he could be innocent despite that. It strikes me as not fairly incriminating evidence either. That's my argument before this Court, that, you know, the fact that he has the phone number of two of his brother's close associates, his twin brother's close associates, doesn't strike me as fairly incriminating evidence. And that's what we have to have independent of these statements. I don't see that here. But I think – and I want to say because I think we were talking about whether this is the crux of my argument. I do think there's an additional argument that I want to – Let me stick with that for just a second. Sure. I'm trying to think whether it's fairly incriminating. And I'm thinking if I have a phone number of some friend of one of my children where the kid told me that he or she was going to be staying on a trip to California. Right. It doesn't mean I know anything about the friend's business. Right. And your argument would be the Revueltas, it's like that. However, if I have a card for a restaurant in my pocket, it probably means that I eat at that restaurant. Mm-hmm. And I'm thinking the Revuelta brothers' phone numbers could be taken to be like the restaurant card. And this is a matter of perception. My point is that Ricardo clearly spent part of his life in a – or, you know, lived his life surrounded by drug dealers. His brother was a – twin brother was a drug dealer. Some of his brother's close friends – his brother testified these people were his close friends – were drug dealers. I mean, it's not surprising that Ricardo was around drug dealers. That isn't enough, however, to convict Ricardo of this crime. And it also certainly isn't fairly incriminating evidence. And my point is if you look at the context of – and the $1,800 come – fit in on all this. Well, you know, the conspiracy that the government is charging started in April 2000 and ended in June 2001. There was, you know, over 11 pounds of methamphetamine that were distributed – that were sold to the government in that conspiracy. He was found with 79 – his only involvement, alleged by the government, was in May and June 2000. In 2001, a year and a half later, he was found with only 79.6 grams of low-grade methamphetamine that was, you know, not nearly the same grade of the methamphetamine that was before. Even assuming for the sake of argument, and I'm not saying that this is the case, he was some small-time drug dealer, that doesn't show that he was a member of that large conspiracy. As a matter of fact, on that same day when he was arrested, you know, his brother sold 9 pounds of high-grade methamphetamine to the government. The government does not contend that he had anything to do with that. It was higher grade than what was found in Ricardo's pocket? Significantly. And there's no evidence, and the government doesn't allege that he was involved in that sale that exact same day. He was found with 79.6 grams. He was charged separately and sentenced separately for that crime. But there's no nexus between that 79.6 grams and the larger conspiracy. But to get on something that Your Honor was touching on before, you talked about what the crux of my case was. I do think that there's another argument that I want to spin out before the Court, which is that even if the Court was convinced that my client was tangentially involved in one transaction, I think as a matter of law, that is not sufficient to prove knowledge of the entire conspiracy. What do you mean by tangentially? He had the, I realize you would put 79 grams in a walnut shell, but what is tangential about it? He was there. He had the stuff in his pocket. He had the money. Isn't that pretty direct evidence that he was involved in a deal? Well, okay, what I was referring to is the June 2000 deal, which is what the government alleges that my client was involved in. The 79.6 grams, I don't see the connection, and I submit to this Court, there's no evidence that it's connected to the broader conspiracy. He was found with 79.6 grams of low-grade methamphetamine on him. The quantities that were distributed in this conspiracy were far higher, 11 pounds, and the transaction that went down that day was 9 pounds, and it was much higher-grade methamphetamine. I don't see the nexus there. Now, the government has arguments that he was involved in this June transaction. There was this identification and these statements that we discussed earlier, and I'm saying that even if the Court credits those statements and thinks that he was the twin brother there in June, my point is that that involvement in June is not sufficient to support knowledge of the entire conspiracy under this Court's precedent in United States v. Umagaw. As a matter of fact, I think it's right on point, because in that case, you had a four-transaction conspiracy. You had people who contributed to one of those transactions. They procured a car, and it was clear that they furthered that transaction. But the Court held that, you know, yeah, these guys got a car for a single transaction. That doesn't mean that they knew of and joined this overall conspiracy. And, yeah, my client is an identical twin to a man who was running a large conspiracy. Even if you credit the evidence and say he was somehow involved in this one transaction, that does not mean that he knew of and willingly entered into this overall conspiracy. Counsel, you're down about 10 minutes. Okay. So I reserve the rest of my time for rebuttal. Thank you. Good morning. May it please the Court, I'm Mark Silversmith for co-defendant Eduardo Sandoval Mendoza. I'd like to reserve two minutes of my time for rebuttal. The trial below was riddled with numerous constitutional errors, as I set forth in my briefs. At this point, I think it should be beyond dispute that the case has to be reversed for the Getter's error when the Court ordered me not to talk to my client about his testimony for some 28 hours. Counsel, help me on something about the Getter's error. Okay. The question is whether it's structural. The question for me is whether it's structural or whether you have to show prejudice. I don't think you've made a showing of prejudice, so you need it to be structural. Reading Getter's, they don't say it's structural. It kind of sounds like it's structural. But Getter's came down before the Supreme Court had distinguished between structural and trial error. They just had not yet come up with these two subsets of error with any clarity at the time Getter's came down. They used to reverse for big constitutional errors in those days without any showing of prejudice. So how are we supposed to decide whether it's structural? Well, Perry v. Leak, the Supreme Court unanimously said it was structural error. And they addressed that issue first, and then they discussed whether the 15-minute recess was Getter's error, and they said, no, that's not Getter's error. I think the holding in Perry would be that your short recess is not structural error. But they did it in reverse. If you read the opinion and address it. You're saying you're bound by the determination that it is structural or if it's too long. Right, and Getter's has been subsequently cited repeatedly in cases which show where the Supreme Court has identified the limited circumstances that are structural error, cases in which involve the fundamental access to counsel and the way the counsel tries to counsel. All right, but there is no fundamental right to counsel or access to counsel during cross-examination, is there? For short periods, what the Court said is you can assume that a nothing-but testimony will be discussed. I'm looking at footnote 8 of Perry v. Leak, which says, the judge may permit consultation between counsel and defendant during such a recess, but forbid discussion of ongoing testimony. I read that as holding that there's no constitutional right under those circumstances. In a 15-minute recess, what the Court said is you can assume that nothing's going to be discussed. But what the Court has said that in an overnight recess. Oh, you're missing my point. It doesn't matter whether it's 15 minutes or overnight or over the weekend. There is no constitutional right to access to counsel with respect to ongoing cross-examination, is there? Yes. In an overnight recess, what the Court has said is. . . Well, what the Court has said overnight is you can talk about anything you want, except the ongoing cross, that if you're in the middle of cross, you can't talk about that. But what the Court in Santos and Mudd and Cobb, each of those circuit courts, including Justice Scalia, examined the very question that you're asking, Judge Joe Scanlon, and said that's impossible to distinguish between talking about testimony and talking about strategy. Because if I have to talk. . . First of all, I can't show prejudice because I would have to reveal what I'm talking to my client about. Second, I tried to show some aspects of prejudice to the Court, and the Court wouldn't let me. And third. . . Oh, now I've lost my train of thought. What they said is in strategy, if the client's testimony, which in this case was the alpha omega of the case, he talked about everything from even before the government witnesses got on until after the government witnesses. He talked about every aspect of the case. How am I going to talk to him about preparing a defense to what's going on without saying, you know, this came up in testimony. We have to find a witness who's going to say this. This came towards the very end of the case, and the judge cut us short on our argument time, and it all ended very quickly thereafter. This was a critical time in the defense when I needed to consult with my client about strategy. And if I have to tell you what kinds of things I would be discussing with my client, that would invade the privilege. And that's what the case is specifically saying, Cobb and in Mudd. Specifically, Judge Mikva elaborates on that, and in Cobb they elaborate on that, and Judge Scalia concurred in Mudd and said essentially that. So I think it's clearly structural error, whether you go with what Perry said or whether you go with what every subsequent circuit case said. I'm curious about something that you didn't say about Perry in response to Judge O'Scanlan's question. Okay. And I'm thinking, gee, maybe I missed it or missed something or misunderstood. I had thought that what footnote 8 was about in Perry was brief recesses because the previous sentence says it's the beginning of a paragraph, and it says such brief recesses. And then the next sentence is what the discretion of the judge is, and it has footnote 8 that the judge can prohibit consultation or restrict it. And I thought you were just going to stick with Perry, which we're bound by instead of cases from elsewhere that we're not bound by, and say that's what it says. Have I misunderstood Perry? Does it not do the job for you? I think you're right, and I think I said that, but I think Judge O'Scanlan disagreed and then I made a subsequent argument. But maybe I missed it. Okay. I get it. I agree with you, Your Honor, but perhaps your colleague doesn't. Let me ask you about something else. Yes. I want to read the medical report that the jury did get to see about the brain tumor. Right. Where is it in the excerpts? What page?  Thanks. I cited it in my brief. Okay. I don't want to take up all your time with it. I just want to look at it. Okay. There was a whole stack of them. That's the one that I cited that says that my client had his brain was compressed and there was an area of necrosis, which I used to argue that he had brain damage. Most of us, any of us who've done PI work or any of us who've had acquaintances with brain tumors know they're pretty diverse in their effects. Sometimes they affect mood a lot. Sometimes they affect intellect. Sometimes they don't affect either one, but the people get headaches and they feel sick and tired. Yes. It just varies a lot. And I wanted to see the record. How big does it say the brain tumor was? Four centimeters by four centimeters by five centimeters, about the size of an apricot. It's the largest one any of these doctors had ever seen. No kidding. Four by four by five centimeters. It's about that big. So that's a big apricot size. Big, massive tumor. And where was it in the brain? It was on a pituitary gland, and it compressed the medial and left frontal lobes. And there was a signal change, according to the MRI, that indicated an area of necrosis. It did compress the frontal lobes? Yes. And how much necrosis was there? Minimal, as I recall. Yes, a small area. I think he said, if I can remember, a small area of necrosis. Counsel, you're down to less than two minutes. I know you want to reserve some time. Yes. Can I briefly address the entrapment as a matter of law? Because I think that's a very strong issue. And I think the real question the court's going to have is whether to remand it for a new trial or to acquit my client. Because what the government did is my client testified about his entrapment. And he spent a lot of time testifying about the five- to six-month period before the conversations were recorded. And he talked about how the government preyed upon his fear of death and his sense of responsibility to his family and pressured him into getting involved in the drug business. And that just meant he went completely unrebutted. They decided not to present any evidence to counter that. And I think it's just like the scary case where it's unrebutted and the court has to acquit him as a matter of law. And I don't see that anything that the government has put forth in their trial or in their briefs that disputes that fact. Why don't you reserve the rest of your time, less than a minute. Thank you, Your Honor. We'll hear from the government. Good morning, Your Honor. May it please the Court, my name is Erica Frick on behalf of the United States. I want to make sure to have a chance to respond to two points that were raised with the defendant's arguments. The first one, the getter's error, and the second one, the sufficiency of the evidence against Ricardo. On the getter's error, first, the government submits this was not error at the outset and believes that the second overnight recess after the close of cross-examination and before the beginning of redirect distinguishes this case from any case that's been cited by the defense. I don't understand it. It looked to me like the law was pretty clear under Getters and Perry that a judge can tell a defendant and defense counsel no consultation or no consultation about the testimony during a brief recess and cannot for an overnight recess. What am I missing in terms of the words of those cases? Well, that's not my reading of the cases. I believe that it's a more- Okay, tell me the words. I've got the cases right here. Okay, well- Just tell me what words to look at, what pages. Okay, let me turn to that here. Perry, I guess, is- Perry holds that there is no constitutional right to- when a defendant becomes a witness, he has no- There is no constitutional right with respect to what? You've got to be very specific. Right. This is the quote. When a defendant becomes a witness, he has no- What page? I'm sorry, 281 of Perry, 488 U.S. 281. Got it. And the quote is, When a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying. The government believes that- Wait a minute, I don't see this on 281. Are you looking at- Are you talking about the distinction rests on the fact that when a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying, that paragraph? Yes. Okay. Okay, but then they go on and elaborate in the subsequent pages. And what they say, it looks like page 284 is the critical page for this case. Tell me how to read 284 your way. I assume you're looking at the case and not just the excerpts in your brief. This is the case, yes. Good. Okay, tell me how to read 284 your way. Let's see. Okay, I assume you're talking about the language that talks about the interruption and getters. The paragraph that starts with the interruption and the paragraph that starts with our conclusion and footnote 8, it looks to me like that's the page that we have to study. Well, in order to interpret this language, because obviously this is dicta in the context of Perry itself, in order to interpret this language, we have to look at the underlying rationale for this rule. I don't know if it's dicta or holding. What they're doing in Perry is they're qualifying getters. They're distinguishing getters. And this tells just how far the distinction goes, and probably they had to limit how far they went in order to put a majority together. I think in order to read Perry beyond its actual holding, we have to look at the rationale for the rule that it's articulating here. And the rationale is that to the extent that there's no right to be coached by your attorney about cross-examination. Now, to the extent of cross-examination or while cross-examination is going on. Right, and the government believes that that rule should not, the application of that rule should not turn on the fortuity of when a recess occurs during a trial. The problem is if you tell the lawyer and the defendant you can't talk about the testimony, that goes beyond coaching. And one discussion might be based on your testimony so far, I think you ought to plead tomorrow morning instead of continuing with this trial. It would be a discussion of the testimony, and then there might be discussion of what the testimony would be tomorrow that might show that a plea isn't necessary. I can't draw the distinction so neatly. Even assuming that that's the case, that there's a fuzziness between the coaching and other issues that might possibly implicate cross-examination. You call it coaching when it's the other side's lawyer, and you call it preparing when it's your side. Of course. But there is a distinction between coaching and what other issues, other tactical decisions that might be legitimate for the attorney to discuss with his client. But in this case, despite being given several opportunities, defense counsel never articulated to the court what decisions it might need to discuss with its client that were barred by this rule against coaching. And then, in addition, there was a second overnight recess which was unfettered, in which anything that he could hypothetically not have been able to discuss with his attorney the night before, that could have been remedied. What he wants to talk about is the testimony that's going to be between the first night's recess and the second night's recess. That could be the case in some case, Your Honor, but that sort of prejudice was never articulated here. What do you say to your adversary's contention that, number one, Getter says you don't have to show prejudice, and so does Perry, and, number two, you can't show prejudice without breaching the confidentiality of lawyer and client communications, and, number three, the judge wouldn't let him show prejudice anyway? Your Honor, let me address that question, because in the instance that the court disagrees with our basic interpretation of Getters and Perry, that doesn't matter because this court has actually held that this is not structural error, the type of restriction that's put here. Which case can you say it's not? It's United States v. Lucas, and the site is 873 F. 2nd. Is that in the brief? 1279. It's not, Your Honor. I found the case after I saw the reply brief. Please leave with the deputy gum sheets with copies for everybody so that we all know about the same case. I will, Your Honor. And if you'd like, I can file a 28-J letter when I get back to the office that explains the case. This case actually ñ It would be nicer if you had filed a 28-J before you got here. I understand, Your Honor, and apologize. This case actually involved a slightly different situation, but it is analogous, which is that Lucas claimed on appeal he was denied counsel because there was a ñ during his pretrial detention, he was approximately 120 miles away from his court-appointed counsel, and there were times in which he couldn't communicate with his counsel. That sounds like it's not even worth looking up. It's not an order during trial. It is, Your Honor. You can't talk to your lawyer overnight about your testimony based on your description. If I can explain. It goes on to have a pretty in-depth discussion of getters, and it talks about the fact that only when a limitation on discussions with counsel is absolute. It can't be just a restriction like it was here, just some sort of restriction on what the counsel can discuss or what times or place. It can't be that sort of time, place, manner restriction. In order to be structural error, it has to be a complete bar on communications between counsel. Otherwise, it is subject to harmless error review. What court are we talking about here? Lucas? Ninth Circuit, this court. One of our cases? Yes. But it's about during pretrial detention? It is, Your Honor, but if you look at the case, I can read from it to you if you'd like, but it makes it very clear that this is a general rule. I don't really use them like Bartlett's familiar quotations. I tend to look at them in terms of the principles to resolve the disputes raised on those facts. That's why I asked if it was pretrial detention. It is pretrial detention, and it talks about the fact that only an altogether complete bar on access to counsel is structural error. So if I can, I'd like to turn to the evidence against Ricardo since the sufficiency. Before you leave, Eduardo, I just wondered, what's your position on entrapment? My position, Your Honor, is that he has fallen far short of showing the undisputed evidence, making it patently clear that an otherwise innocent person was induced to commit this illegal act by trickery, fraud, or persuasion. And what we have here is an enormous record. We have about 100 recorded calls, and it's the government's burden, of course, to show that there was not inducement or that there was predisposition here. And in this enormous record, we have absolutely no evidence of any inducement, other than just suggestion of illegal activity. Well, the government suggested it. That's inducement. That doesn't rise to the level of inducement by itself, Your Honor. Most sting operations involve situations where the government is involved in suggesting. Well, yeah, in most proposed entrapment defenses, the inducement element is established and is predisposition. That's at issue. But, for example, in the Scarry case, the inducement was much, much greater than here. There were basically threats. There was a chicken on a stake put in the person's front yard. And that's the sort of inducement that these cases ñ there's no case analogous to this one where inducement has been found. In any event, there's abundant evidence in the record of predisposition. He was very fluent in drug trafficking language. He constantly was talking about his prior drug dealing. And the jury, of course, was allowed to draw the reasonable inferences from that evidence. So the entrapment defense, as a matter of law, just simply falls far below that standard here. Can you help me on the brain tumor? It struck me that there is one practical way to establish for a jury whether a brain tumor impairs a person's thinking and ability to control his conduct in a material way or not, and that's to have doctors testify about it. That's the way it's always done in PI cases. It's the way it would ordinarily be done in a criminal case, I would think. And it wasn't done here. I don't understand that. The critical problem, Your Honor, and the reason that the trial court did not err by excluding these experts is that the experts never established any causal connection between this tumor, which had been successfully treated, and any susceptibility to inducement. There just was never a causal connection made. There are many defendants who, in one way or another, have a mental deficiency, and that doesn't relieve them of criminal culpability. The trial court here made it very clear that if defense counsel had shown that causal connection, then the analysis would have been very different. But because the causal connection wasn't shown, the evidence wasn't relevant. I thought the physicians did testify, although they were in conflict, of course, about the effect of the tumor on cognition. And as far as successful treatment goes, I thought it was undisputed. The tumor is still there. It's still huge. And there's still a lot of dead, or not a lot, but some dead brain tissue. So successfully treated only means it does not appear to be progressing rapidly at this time. It was my understanding, Your Honor, that the tumor had been treated with drugs and had actually shrunk in size. And also I'd like to point out that the defense's theory, in terms of its defense, did shift over the course of the trial. At some points it was saying the tumor was relevant because the government preyed on his fear of dying to induce him. At other points they said he was brain damaged. At other points they said he was mentally retarded. It can be all those things. Well, assuming... If you have a brain tumor the size of an apricot, you're likely to be impaired in your, depending on where it is, your mood, your intelligence, and to fear dying. One doesn't exclude the other. That is correct, Your Honor, but the experts, when they testified, the connection between any impairment, regardless of what its cause was, and susceptibility to inducement was speculative at best. And we cited a number of those passages and problems in our briefs. Why wasn't it a jury question? Well, for one thing, the judge was very concerned about the... There was an alternative holding that in addition to failing to show a causal connection, so it wasn't relevant. In addition to that, the judge found that, and in part due to that, that it would have been overly confusing and distracting during the trial to have these experts paraded in who weren't actually testifying to anything particularly relevant or helpful and then having rebuttals. Here's why that bothers me. What the guy has is a whole lot of evidence from the doctors and from family members that he's really, really stupid. He drinks a glass of urine even when he was told it was urine because he forgot. He buys a brick in a box thinking it's a computer. They're building their case for entrapment. Now, entrapment as a matter of law, that's a different thing, but we're talking about giving the jury a reasonable doubt about whether he was just bragging in his predisposition test evidence on the inducement. And then you've got all this medical evidence that he's got a tumor the size of an apricot, and that's a really big tumor that really affects a person's brain and affects his frontal lobe. But the jury doesn't get to hear any of that. They just hear Eduardo, who has a tremendous motive to lie, blaming his dope dealing on a brain tumor. And they have no reason to believe him. Without corroboration, they're not likely to believe much that any defendant tells them. Your Honor, I would submit that even if we were to assume that this exclusion of experts was error, that excluding it was harmless beyond a reasonable doubt. And the reason for that is that the record here, which is very large, makes it very clear that although Eduardo may have been a little bit slow, he was a very competent or certainly competent individual who was able to coordinate and structure relatively complex drug deals and to continue to escalate the drug dealing activity. And he's got his brother involved. He's got his brother-in-law involved. He's got a cook in Mexico involved. And it just at the end of the day, this expert testimony wouldn't have made a difference. I think we understand your argument, counsel. You've only got three and a half minutes left to talk about Mr. Ricardo. Okay. Yes, I would like to address this because as you were asking defense counsel if the critical question is the admission of Eduardo's statements, the government submits that that is not the critical question here because even if you put aside Eduardo's statements, there was sufficient evidence to convict here. And based on that sufficient evidence to convict, his statements were clearly admissible. And I'd just like to go through the list of that evidence to make that more clear. First of all, this is, of course, a limited standard review, whether any rational juror could convict. Okay. The first and probably most important evidence is Ricardo's attendance at the June 1st meeting. Although Eduardo planned the meeting, Eduardo placed a telephone call to Ricardo's home telephone number approximately 30 minutes before that meeting. Is that the one where the agent sees him in the car? This is that one. At the actual meeting, when Ricardo suggests moving the meeting, he gives his South Garden address. The South Garden address is Ricardo's address. Ricardo states, no, let's go to my house, not to my brother's house, and then gives the South Garden address. There's no plausible explanation for that other than that this is Ricardo. After the meeting, aerial and ground surveillance follows Ricardo back to Ricardo's home at the South Garden address. After the meeting, the piece of paper on which Ricardo wrote his address is submitted into evidence. We know from defense counsel's post-trial investigations that the jury conducted its own handwriting analysis legitimately based on evidence that was in the record, compared that handwriting to two samples it already had of Eduardo and Ricardo's handwriting, and determined it was Ricardo's handwriting. We also have Ricardo's post-address statement admitting that he was at a meeting with the CI who was driving a 4Runner. Now, admittedly, that was identified as a May meeting rather than June, but that was the questioning agent's error, not Ricardo's error. So the questioning agent accidentally, inadvertently said May, when in fact it was the day after May. It was June 1st. And finally, it's not even necessary because that evidence alone is sufficient to show the central role of Ricardo in the conspiracy, or at least that portion of the conspiracy. We have the agent's identification, which is really just the icing on the cake. In addition to all that evidence, we know that this meeting was conducted with the purpose of consummating a two-pound meth deal, that the only reason it didn't happen was the courier was late. That same deal was consummated on June 15th. In addition to that, we have further circumstantial evidence in terms of the circumstances of Ricardo's address with the drugs packaged for sale in his pocket, the cash, the scale, the card with the Revuelta's phone number, more circumstantial evidence. And then finally, but unnecessary, we have Eduardo's statements, several statements on May 3rd, May 4th, May 25th, leading up to the June 1st meeting implicating Ricardo. The government submits that this is far more evidence than is necessary to support that conviction. Thank you, Counsel. We'll hear from Mr. Zilbersmith. You have about 59 seconds, or 49 seconds, sorry, although it could go to either side. You have about a minute to speak, if you would, Mr. Zilbersmith. I'm going to be notifying you every night. Your Honor, just briefly, on the Perry Note Eight, if you look at that, the Supreme Court is citing an Illinois case that talks about a 30-minute recess. So I think Judge Kleinfeld is right that they're talking about a short recess in that case. As far as entrapment as a matter of law, they have to show that before the government got involved, he had no predisposition – before the government got involved, my client had no predisposition. The hundred calls are all after the government got involved. There's no evidence to rebut what my client said happened before the government got involved at the very early stages. There's no case analysis because there's no – analogous, because there's no case in which the government hasn't put on their informants to create some contradiction in the evidence. His evidence went uncontradicted. And as far as the language he said on the tape about past drug dealing, I think if you imagine that there's two agents in this case, one's from the DEA and one's from the local department of Bureau of Narcotics Enforcement, the State Department. Suppose the Bureau of Narcotics agent, Larry Wallace, says to Carlos Ruiz at the end of the case, hey, you know what, we've got nine pounds of methamphetamine. I know a guy. Let's sell it to him for $25,000 and I'll split it with you. I know you've got a kid that's sick or he says if you don't do it, you know, I'm going to make your life hell and I'm going to threaten you. If Carlos Ruiz gets on trial after agreeing to that under duress or under entrapment, is he going to be barred from raising this defense because he says on all these tapes about all these past drug dealers, deals that he made? He made them up the same way that my client made them up. I don't think that the fact that he talks about uncorroborated past deals can bar him from being entrapped as a matter of law. And if you want me to address the experts or the false argument or any of the other issues, I'm happy to do that. I think we've heard your position. We understand and we compliment you on your very thorough briefs, by the way. Oh, thank you. Thank you. The case just argued will be submitted for decision. And we have two remaining cases, which we're going to hear after we take a short recess. Our counsel here on the two remaining cases, by the way, that would be Mr. Bakuri and Mr. Sequenza. They're both here. All right. It'll be after the recess.
judges: Goodwin, O'scannlain, Kleinfeld